United States District Court
Southern District of Texas
**ENTERED**
September 17, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## LAREDO DIVISION

| | | |
|---|---|---|
| **CARLOS H. GONZALEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 5:22-CV-116** |
| | § | |
| **ZAPATA COUNTY, RAYMUNDO DEL** | § | |
| **BOSQUE, JR., JOE PEÑA, JAIME** | § | |
| **RENE RIVERA, CARLO GARCIA,** | § | |
| **AND JOSE MARTINEZ,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

Zapata County Sheriff's deputies encountered Plaintiff Carlos H. Gonzalez ("Gonzalez") and his disabled pickup truck on a remote stretch of highway one evening in October 2022. Gonzalez alleges that this encounter—which was initially consensual— evolved into an unconstitutional detention and search. The deputies did not recover any evidence of criminal activity, and Gonzalez was on his way. Days later, the Zapata County News published an article falsely naming Gonzalez as a "known human smuggler" and alluding to him as a human trafficking "scout." The newspaper editor wrote the story based on a law enforcement report she received from the Executive Chief Deputy Sheriff. The editor copied the report's text but omitted Gonzalez's biographic data, like his driver's license information and address.

Gonzalez sued the County, the Sheriff, multiple deputies, and the newspaper[1] for violations of his constitutional rights under 42 U.S.C. § 1983. While the case was pending, Gonzalez alleges that the Sheriff ordered his deputies to harass Gonzalez. Gonzalez pleads that on one occasion, the deputies effected another fruitless unconstitutional seizure and search of Gonzalez's vehicle. The question before the Court is whether the Zapata County Sheriff and other deputies violated Gonzalez's constitutional and

---

[1] Gonzalez has voluntarily dismissed his claims against Defendant Zapata County News. (*See* Dkt. No. 50).

statutory rights and whether Defendants are entitled to qualified immunity. Also at issue is whether the County is liable for the acts of the Sheriff, as final policymaker.

Before the Court are Defendants' motions to dismiss. (Dkt. Nos. 57, 58, 59, 60, 66, 75). Each Defendant filed their own motion, though because the substance of their arguments is nearly identical, Gonzalez has filed a consolidated response to the multiple motions. (Dkt. No. 65; *see also* Dkt. Nos. 71, 76). Defendants then filed a consolidated reply. (Dkt. No. 68; *see also* Dkt. Nos. 72, 77). Having considered the parties' briefing, counsels' arguments, and the applicable law, Defendants' motions to dismiss will be **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

Gonzalez pleaded the following facts in his Second Amended Complaint, (Dkt. No. 56), which the Court must accept as true. *See, e.g.*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).

At approximately 9:00 p.m. on October 19, 2022, Gonzalez's pickup truck ran out of gas on an uninhabited stretch of U.S. Highway 83 in Zapata County. (Dkt. No. 56 at 9). He flashed the truck's headlights to summon a nearby police car for assistance. (*Id.*). Deputies Rivera and Garcia drove up to Gonzalez and questioned him about why he was pulled over on the side of the road. (*Id.*). Gonzalez responded that he had run out of gas after taking a "cruising" trip to San Ygnacio to meet friends. (*Id.*). He asked the deputies for a ride back to Zapata. (*Id.*). The deputies told him that they would not give him a ride back to Zapata or offer any other assistance. (*Id.*). Gonzalez then called his cousin within earshot of the Deputies. (*Id.* at 13).

Deputies Rivera and Garcia asked Gonzalez for consent to search his truck, communicating to him that they suspected him of smuggling people or drugs. (*Id.* at 9). He initially declined to give the deputies consent. (*Id.*) The deputies told him that if he did not allow them to search the vehicle, they would call in a K-9 unit. (*Id.* at 10). After a K-9 unit arrived, Gonzalez "told them to go ahead" with the search of the vehicle. (*Id.*) Other sheriff deputies and U.S. Customs and Border Patrol officers arrived. (*Id.*) Deputies Rivera and Garcia searched Gonzalez's truck and inspected a notebook in the glove compartment. (*Id.* at 10–11). Finding no evidence of human or drug smuggling, the law enforcement officers left Gonzalez with his stalled truck on the side of the road. (*Id.*

at 11). Gonzalez estimates that the entire encounter lasted over an hour. (*Id.*)

On October 27, 2022, the following story was published on the front page of the Zapata County News:

## Cruising Around to Find Illegals

Wednesday, October 19, 2022 at 8:47 p.m. *Zapata County Sheriff's Deputies* located at U.S. 83, North of High Rest area observed a blue Ford F-150 1991 model heading north bound after shortly heading south bound.

The vehicle was observed heading north when it came to a stop with hazard lights on. The deputies then made a consentual contact encounter with the driver identified as Carlos H. Gonzalez, 20, a known human smuggler. He stated he was test driving his truck, shortly after stating that he was heading

**Continued on Page 2**

## Cruising Around to Find Illegals

to and from San Ygnacio and Zapata to cruse. Deputies overheard him telling Carlos Campos, another known smuggler that he ran out of gas with the $20 he had given him. He stated he should know where he is by already having his location.

Border Patrol showed up taking some intel and being alerted with a short ledger spotted by the deputies in the vehicle. Later, *Border Patrol* caught five illegal aliens in the brush within the area, where the scout had placed the truck on the shoulder lane.

(Dkt. No. 56 at 12–13).

Upset, Gonzalez's mother visited the newspaper to inform the editor, Karran Westerman, that the story was not true. (*Id.* at 13). Ms. Westerman told Gonzalez's mother that Zapata County Sheriff Raymundo Del Bosque and Executive Chief Joe Peña provided her with the information that she published. (*Id.*). In a declaration attached to Gonzalez's Second Amended Complaint, Ms. Westerman states that she receives content for her weekly stories from Executive Chief Peña, and that Peña's disclosure was authorized by Sheriff Del Bosque. (*Id.* at 14).

The published story was an almost identical recitation of the factual content of a Border Incident Assessment Report ("BIAR") authored by Deputy Rivera (*Id.* at 14). BIARs are non-public intelligence documents that are shared among law enforcement

agencies for investigation purposes. (*Id.* at 19). The Zapata County Sheriff's Department produces the BIARs in accordance with their membership in the Laredo Joint Operation and Intelligence Center. (*Id.*). The standardized BIAR forms contain areas for officers to input data such as a person's driver's license number, vehicle identification number (VIN), citizenship status, and personal biographic information. (*Id.* at 20). Gonzalez's BIAR contained his name, date of birth, home address, height, weight, eye color, license plate number, and driver's license number. (*Id.*). However—notably—the Zapata County News story did not include any of this personally identifiable information other than Gonzalez's name, as seen above.

Gonzalez alleges that the newspaper article referring to him as a "known human smuggler" and a "scout" has caused him to cease traveling across the border into Mexico to visit family. (*Id.* at 33). Fearing that he may be harmed by Mexican cartels who may view him as a business competitor, Gonzalez experiences severe emotional distress, "sadness, loss of sleep, fear, anxiety, depression, and despair." (*Id.*). He also fears retaliation by the Zapata County Sheriff's office and its supporters. (*Id.*). Gonzalez states that the Sheriff's office has repeatedly refused to respond to theft and menacing complaints made by his family. (*Id.* at 33 n.17).

Gonzalez sued Zapata County, Sheriff Del Bosque, Executive Chief Peña, Zapata County News, and Karran Westerman on December 21, 2022. (Dkt. No. 1).

Several months later, on May 25, 2023, at around 10:00 p.m., Gonzalez was stopped by Zapata County Sheriff deputies in an unmarked car for failing to fully stop at a stop sign. (Dkt. No. 56 at 31). Gonzalez disputes the charge, contending that deputies pulled him over in retaliation for suing the Sheriff. (*Id.* at 30). Gonzalez states that "[s]econds after the undercover squad car pulled [him] over, four or five additional Zapata County sheriff vehicles, including a K-9 unit, swarmed in from different directions." (*Id.* at 31). Of the deputy responders, Gonzalez was only able to identify Defendant Deputy Jose Martinez, who handled the entire interaction that night. (*Id.*).

Deputy Martinez asked for Gonzalez's consent to search the truck. (*Id.* at 32). Gonzalez declined to give consent, accusing the Sheriff's Department of retaliating against him. (*Id.*). Deputy Martinez asked Gonzalez a second time for consent to search the truck. (*Id.*). He refused again. (*Id.*). Gonzalez states that "[a]fter approximately 30

minutes went by without a single officer departing the scene, [he] understood that he was not going anywhere until he agreed to a vehicle search." (*Id.*). Gonzalez consented to a search of his truck. (*Id.*). After approximately thirty minutes of searching, Deputy Martinez did not find any incriminating evidence. (*Id.*). Gonzalez estimates that the entire encounter lasted over an hour. (*Id.* at 31).

On November 6, 2023, Gonzalez filed a Second Amended Complaint, adding Defendant Deputies Rivera, Garcia, and Martinez, and Fourth Amendment causes of action based on both police encounters. (*See* Dkt. No. 56).

Each Defendant has moved to dismiss the claims against them. The law enforcement Defendants assert the affirmative defense of qualified immunity.[2]

## II. LEGAL STANDARDS

### A. Gonzalez's Causes of Action

Gonzalez alleges that the individual officers were acting under color of state law in their individual and official capacities. (Dkt. No. 56 at 7–8). He brings a Fourth Amendment claim against all Defendants based on the two nighttime traffic encounters. Gonzalez brings a Fourteenth Amendment claim against the County, Sheriff Del Bosque, and Executive Chief Peña for stigma to his reputation "plus" infringement of his Fourth Amendment rights and his protected privacy interest. Gonzalez also alleges that all Defendants conspired to violate his rights under Section 1983, and that Sheriff Del Bosque and Executive Chief Peña violated the federal Driver's Privacy Protection Act ("DPPA"). Finally, Gonzalez alleges that Defendant Zapata County is liable under *Monell v. Department of Social Services* for ratifying unconstitutional policies and for the illegal acts of its final policymaker, Sheriff Del Bosque. All Defendants except the County assert qualified immunity on all claims against them. 436 U.S. 658, 694–95 (1978).

### B. Federal Rule of Civil Procedure 12(b)(6)

All six Defendants seek dismissal of Gonzalez's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. (Dkt. No. 57 at 2). Under the Federal Rules of Civil Procedure, a pleading must contain a "short

---

[2] Each Defendant filed a separate motion to dismiss with similar or identical arguments. To avoid unnecessarily long citations to each of the motions, the Court cites to one that sufficiently represents the argument made in all.

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied sub nom; Cloud v. United States*, 536 U.S. 960 (2002) (citing Fed. R. Civ. P. 12(b)(6)). A court must accept the factual allegations contained in the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Id.*

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, a court does not accept legal conclusions as true: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A plaintiff's obligation to provide the grounds of his entitlement to relief requires more than "labels and conclusions" and a "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Twombly*, 550 U.S. at 555).

### C. Qualified Immunity

Gonzalez alleges claims against all Defendants pursuant to 42 U.S.C. § 1983. (Dkt. No. 56 at 36, 40, and 43). The individual Defendants—Executive Chief Peña, Sheriff Del Bosque, and Deputies Rivera, Garcia, and Martinez—each raise the affirmative defense of qualified immunity. (Dkt. No. 58 at 3). Section 1983 provides plaintiffs a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *see also*

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (cleaned up). "Section 1983 does not create substantive rights; rather, it merely provides a remedy for deprivations of rights established elsewhere." *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir. 1991) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). To adequately state a Section 1983 claim, a plaintiff must allege (1) that some person deprived him of a federal right and (2) that the individual who has deprived him of that right acted under color of state law. *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (citation omitted). In a Section 1983 suit, officers may be sued in their individual capacities, their official capacities, or both. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

Qualified immunity protects government officials from money damages and discovery under Section 1983 for acts taken while engaged in a discretionary function, unless the plaintiff shows (1) that the facts alleged, construed in the light most favorable to the plaintiff, establish that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. 42 U.S.C. § 1983; *Ramirez v. Escajeda*, 44 F.4th 287, 291 (5th Cir. 2022). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Qualified immunity shields an officer from liability if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Escajeda*, 44 F.4th at 291 (quoting *Pearson*, 555 U.S. at 231).

For immunity to apply, the "actions of the officer must be objectively reasonable under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law." *Id.* (internal citations omitted). In a qualified immunity inquiry, "whether the conduct of which the plaintiff complains violated clearly established law" is an "essentially legal question." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "An official violates clearly established law if 'then-existing precedent' establishes that the officer's conduct constituted a constitutional violation." *Boyd v. McNamara*, 74 F.4th 662, 667 (5th Cir. 2024) (citing *City of Tahlequah v. Bond*, 595 U.S. 9, 11 (2021)).

The Supreme Court cautions district courts not to define "clearly established law" too generally. *E.g.*, *City of Tahlequah*, 595 U.S. at 12. "The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotations omitted). Specificity is especially important in the Fourth Amendment context "where it is sometimes difficult for an officer to determine how the relevant legal doctrine … will apply to the factual situation the officer confronts." *Id.* at 12–13 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks omitted).

### III. DISCUSSION

#### A. Gonzalez's Fourth Amendment Claim

Gonzalez alleges that Zapata County, Sheriff Del Bosque, Executive Chief Peña, and Deputies Rivera, Garcia, and Martinez violated his Fourth Amendment right to be free from unlawful searches and seizures during either the October 19, 2022, or May 25, 2023, encounters. (Dkt. No. 56 at 43).

At this motion to dismiss stage, the question of whether reasonable suspicion justified a detention of Gonzalez is not at issue in the Fourth Amendment analysis. Gonzalez alleges that the Sheriff's deputies communicated that they suspected Gonzalez of trafficking people or drugs during October 2022 encounter. (Dkt. No. 56 at 9). However, in their consolidated reply, Defendants state that they "absolutely believe that the necessary reasonable suspicion existed, through such a defense will likely require evidence in the record, hence it is not addressed in the instant Motions to Dismiss." (Dkt. No. 68 at 6). Instead, as to the October 2022 encounter, Defendants assert that there was no detention, and the search was valid pursuant to the "consent" exception to the Fourth Amendment's warrant requirement. As to the May 2023 encounter, Defendants assert that there was probable cause of a traffic violation, and the subsequent search was again valid pursuant to Gonzalez's consent.

Each of the individual Defendants has moved for dismissal of Gonzalez's Fourth Amendment claims on the basis that their conduct is protected by qualified immunity. Defendants assert that they acted reasonably under the circumstances, such that a reasonably competent officer would not have known his actions violated then-existing clearly established law.

*1. Deputies Rivera and Garcia's Encounter with Gonzalez on October 19, 2022*

Gonzalez alleges that on October 19, 2022, (1) his consensual encounter with Deputies Rivera and Garcia evolved into an unconstitutional seizure; (2) his consent to a search of his vehicle was involuntary; and (3) his personal papers were impermissibly searched. (Dkt. No. 56 at 43). In its qualified immunity analysis, the Court first considers whether Gonzalez has adequately stated claims against the officer Defendants for violations of the Fourth Amendment.

A voluntary encounter between a law enforcement officer and a citizen may ripen into a Fourth Amendment seizure "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the citizen." *Tyson v. Sabine*, 42 F.4th 508, 516 (5th Cir. 2022) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). If a person has no desire to leave the encounter for reasons unrelated to the police presence—such as being stranded on the side of the road—the coercive effect of the encounter can be measured by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. *See e.g.*, *United States v. Flowers*, 6 F.4th 651, 655 (5th Cir. 2021) (citing *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). This is an objective test using the reasonable person standard. *Vardeman v. City of Houston*, 55 F.4th 1045, 1051 (5th Cir. 2022).

"Where the encounter takes place is one factor, but it is not the only one." *Bostick*, 501 U.S. at 437. If a person is "confined" by the product of their own independent decisions and not by the conduct of law enforcement officers, it says nothing about whether the police conduct at issue was coercive. *Id.* at 435–36. Considering all the circumstances of the encounter, a person would be seized if the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1975)).

Here, Gonzalez pleads, "Deputies Rivera and Garcia told [him] that if he did not consent [to a search of his vehicle] they would bring out police dogs and more cops, which is what happened." (Dkt. No. 56 at 44). He further pleads that "[a]t all times, [he] understood that he was not free to leave nor did [he] have any means to leave except by

walking for miles down a lonely stretch of highway in the dark." (*Id.* at 10). Gonzalez does not allege that Deputies Rivera and Garcia had a role in Gonzalez's being stranded on the roadway with no means to leave. He states that the deputies did not provide him with roadside assistance, leaving him in the same position in which they found him. After the police left, Gonzalez received a ride home from a friend. Gonzalez concedes that he "was not pulled over that evening by police. He did not receive a ticket. He was not arrested. He was not charged with a crime." (*Id.* at 11). Gonzalez further pleads that his "attempt to withhold consent was ignored and he was threatened with more cops and police dogs unless he gave in." (Dkt. No. 56 at 44). Thus, the question is whether a reasonable person would have felt free to decline the deputies' requests or otherwise terminate the encounter. *E.g.*, *Flowers*, 6 F.4th at 655. The Court determines that a reasonable person would not have felt free to terminate the encounter under the facts alleged by Gonzalez. Gonzalez does allege sufficient facts to meet the objective, reasonable person standard for a Fourth Amendment seizure by Deputies Rivera and Garcia on October 19, 2022.

The Defendant deputies do not argue that reasonable suspicion or probable cause supported Gonzalez's detention on October 19, 2022. They do argue—incorrectly—that "even if Plaintiff was detained, the Supreme Court has upheld suspicionless seizures of motorists near the Mexico border given the difficulty of effectively containing illegal immigration at the border itself and reflecting 'longstanding concern for the protection of the integrity of the border.'" (Dkt. No. 60 at 5). Law enforcement officers who conduct routine warrantless, suspicionless stops of motorists *at permanent checkpoints* on or near the border are acting within the bounds of the Fourth Amendment. Here, however, Gonzalez was not apprehended at a permanent border checkpoint. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 566–67 (1976); *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). "The government's power to stop and examine vehicles crossing into this country derives solely from the sovereign's right of self-protection. Motorists lawfully travelling on this nation's roadways are clothed with Fourth Amendment protection from arbitrary government interference." *United States v. Jackson*, 825 F.2d 853, 858–59 (5th Cir. 1987) (internal citations omitted). Thus, the "border search" exception to the Fourth Amendment's warrant requirement does not apply here.

Accordingly, Gonzalez's warrantless detention on October 19, 2022, as pleaded by Gonzalez, was without reasonable suspicion or probable cause and therefore in violation of the Fourth Amendment.

Additionally, the Court finds that Gonzalez met the minimum pleading standard to adequately allege that his consent to search the vehicle was not voluntarily given. A search conducted pursuant to the suspect's consent is excepted from the Fourth Amendment's warrant and probable cause requirements. *See, e.g., United States v. Perales*, 886 F.3d 542, 545–46 (5th Cir. 2018) (quotations omitted); *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991). The Fourth Amendment standard for a valid consent to search is that the consent be voluntary. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). "Consent that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Bostick*, 501 U.S. at 438 (internal quotation marks omitted).

The Fifth Circuit considers the following factors in determining whether a suspect's consent to a search is voluntary: (1) the voluntariness of the suspect's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the suspect's cooperation with police; (4) the suspect's awareness of his right to refuse consent; (5) the suspect's education and intelligence; and (6) the suspect's belief that no incriminating evidence will be found. *E.g., United States v. Galberth*, 846 F.2d 983, 987 (5th Cir. 1988). Other factors include the suspect's age and prior experience with the criminal justice system. *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 555–57 (1980)). No single factor is dispositive. *Id.* Though in most cases, only one or a subset of factors will truly be at issue and drive the ultimate conclusion. *See United States v. Zavala*, 459 F. App'x 429, 433 (5th Cir. 2012). Whether consent to a search was the product of express or implied coercion is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "Acquiescence cannot substitute for free consent." *Galberth*, 846 F.2d at 987 (quoting *United States v. Gonzales*, 842 F.2d 748, 754 (5th Cir. 1988), *overruled on other grounds*.

In the operative complaint and in his response to Defendants' motions to dismiss, Gonzalez asserts that his consent was not voluntary because Deputies Rivera and Garcia

withheld roadside assistance, prolonged the encounter, threatened to call—and did call—a K-9 drug sniffing dog to the scene, called for other officers and border patrol agents, and "repeatedly refus[ed] to take 'no' for an answer." (Dkt. No. 65 at 20; *see also* Dkt. No. 56 at 9–10).

While he does not enumerate the Fifth Circuit's list of factors, Gonzalez's pleadings do address most of them. Regarding the voluntariness of Gonzalez's custodial status, courts should consider whether a reasonable person would feel free to leave. *See United States v. Walker*, 706 F. App'x 152, 156–57 (5th Cir. 2017). Gonzalez sufficiently alleges facts to show that a reasonable person would not have feel free to terminate the encounter, supporting a claim that he was detained. Regarding the extent and level of his cooperation with the police, Gonzalez states that he twice refused consent to search. Gonzalez does not state facts about his education or intelligence level, but he states that he is a twenty-one-year-old U.S. citizen who is employed in the oil and gas services sector. He states that "[a]side from a misdemeanor, Gonzalez has a clean criminal record." (Dkt. No. 56 at 8). Gonzalez does not allege facts demonstrating his belief that no incriminating evidence would be found; however, no incriminating evidence was, in fact, found.

Gonzalez points to the fact that during the encounter, he asked the deputies whether he had the right to refuse consent. (Dkt. Nos. 56 at 9; 65 at 6). However, he does not plead any explicit facts about the deputies' response, only that they "did not explain." (Dkt. No. 65 at 6). Regardless, a person's knowledge that they are free to refuse consent is relevant to the voluntariness analysis, but it is not dispositive. *See, e.g.*, *Mendenhall*, 446 U.S. at 558–559 (citing *Schneckloth*, 412 U.S. at 234).

Gonzalez does allege facts to support the final factor: the presence of coercive police procedures. In the Fifth Circuit, coercive police procedures include "threats of force, promises, trickery, or deceit designed to pressure a suspect into consenting to searches or more subtle forms of coercion that may flaw his judgment." *United States v. Alkheqani*, 78 F.4th 707, 720 (5th Cir. 2023) (quotation omitted). Here, Gonzalez alleges that he twice refused consent to search his vehicle. Gonzalez also alleges that he was "threatened with more cops and police dogs unless he gave in." (Dkt. No. 56 at 44).

In *United States v. Zavala*, an unpublished opinion, the Fifth Circuit applied the six-factor test to a factual scenario analogous to the present case. 459 F. App'x at 434.

The court found that a police officer's "inherently coercive" conduct and the suspect's custodial status rendered a suspect's consent involuntary. There, the officer sat the suspect in the front seat of the police car and "made it clear to the dispatcher" that the officer planned to take the suspect to a nearby immigration checkpoint to "run the dog on him." *Id.* at 433. After hearing this, the suspect agreed to follow the officer to the checkpoint. *Id.* The court also found that because the officer never told the suspect that he could refuse consent, "it is difficult to see how [the suspect] could have believed he was able to refuse [the officer's] request." *Id.* at 434.

As in *Zavala*, the factors of involuntary custody, coercive police procedures, and lack of awareness of the right to refuse consent weigh in favor of finding that Gonzalez has sufficiently pleaded that his consent was involuntary. The additional factor of Gonzalez's lack of cooperation also weighs in favor of involuntariness.

Given the totality of the circumstances, Gonzalez has alleged enough facts to plausibly support a claim that his consent was not given voluntarily. Thus, determining whether the deputies exceeded the scope of Gonzalez's consent is irrelevant. Although the facts may be further developed later in the case, at this stage, the Court must construe the facts in the light most favorable to Gonzalez.

Gonzalez has pleaded a Fourth Amendment violation—the first prong in the qualified immunity analysis. The Court now considers whether Gonzalez's right to be free from an unlawful detention and search of his vehicle in the context of the specific alleged facts of the October 19, 2022, encounter is clearly established. A right is "clearly established" only if it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would know that what he is doing violates that right.'"). "An official violates clearly established law if 'then-existing precedent' establishes that the officer's conduct constituted a constitutional violation." *Boyd*, 74 F.4th at 667. The salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their conduct was unconstitutional. *Hope*, 536 U.S. at 739; *see also Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018) ("[T]he touchstone is 'fair warning.'"). Fair warning

means a precedent of factually similar cases that give "reasonable warning that the conduct then at issue violated constitutional rights." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008).

Because Deputies Rivera and Garcia have raised the qualified immunity defense, it is Gonzalez's burden to show that the officers violated his clearly established rights. *Templeton v. Jarmillo*, 28 F.4th 618, 621 (5th Cir. 2022). Although a plaintiff does not need to identify a case directly on point to meet this burden, he must identify caselaw that "place[s] the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The facts of this case are distinguishable from a typical traffic, or *Terry* stop, by law enforcement officers because the deputies did not initiate a stop. Here, Gonzalez hailed the deputies for roadside assistance because he was stranded on the side of the road. The interaction with the deputies then morphed into a Fourth Amendment seizure when the deputies insisted on searching Gonzalez's vehicle and threatened to call a K9 unit to conduct an open-air search. Indisputably, the law was clearly established that law enforcement officers cannot initiate a *Terry* stop without at least reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989). It seems that the question is whether the law was clearly established that it violated the Fourth Amendment right against an unreasonable seizure for the deputies to insist on searching Gonzalez's vehicle or detaining Gonzalez while a K9 unit was called, without reasonable suspicion or probable cause.

The Court determines that it was not clearly established law that asking a person for consent to search their vehicle or calling a K9 unit to do an open-air sniff, without reasonable suspicion or probable cause that the person had committed a crime, was an unreasonable seizure under the Fourth Amendment. Gonzalez cites a New Jersey state court case for the proposition that reasonable officers have fair warning that asking a driver of a disabled vehicle on a remote stretch of highway for consent to search his vehicle is coercive and violative of the Fourth Amendment. (Dkt. No. 65 at 18–19); *State v. Elders*, 927 A.2d 1250, (2007). Gonzalez also relies on *Schneckloth* for the proposition that "[t]he Fourth Amendment requires that consent not be coerced." (*Id.* at 19) (citing *Schneckloth*, 412 U.S. at 219). He cites *Hunter v. State* to illustrate an instance where

officers' search of a suspect's bag was constitutional because "nothing in [the] facts conveyed a message that appellant was required to comply with [the officer's] request." 955 S.W.2d 102, 104 (Tex. Crim. App. 1997); (Dkt. No. 65 at 19–20). None of these cases speak to the particular situation at hand.

Gonzalez argues that "it is well-settled law that the actions taken by the defendant deputies such as withholding roadside assistance, prolonging their encounter, surrounding Gonzalez with backup law enforcement and police dogs, and repeatedly refusing to take 'no' for an answer fails to meet Fourth Amendment requirements." (*Id.* at 20). However, Gonzalez fails to cite to any well-settled law supporting this argument. In the Fifth Circuit, a plaintiff does not meet his burden of showing clearly established law by merely citing caselaw about general violations of the Fourth Amendment, such as obtaining consent through coercion. *See Templeton*, 28 F.4th at 621 ("Citing caselaw generally referring to the prohibition on officers' using excessive force does not suffice.").

First, the deputies did not violate clearly established law when their encounter with Gonzalez evolved from a consensual one to a detention. In this case, Gonzalez acknowledges that the deputies did not initiate a traffic stop. Gonzalez alleges that he flagged down the deputies for roadside assistance. He alleges that at a certain point, the consensual encounter with the deputies evolved into a detention because he was no longer free to leave. However, the deputies did not have fair notice that their conduct "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business" Under the specific facts of this case. *Bostick*, 501 U.S. at 437. Therefore, although the Court has determined that Gonzalez was ultimately subject to a seizure under the Fourth Amendment, the facts of this case do not establish a violation of a clearly established right.

Next, the Court considers whether the deputies violated clearly established law by searching Gonzalez's vehicle after he expressed consent but subsequently claims that his consent was involuntary. In this case, Gonzalez alleges that the deputies asked for his consent to search his vehicle and that he ultimately expressed consent, albeit under duress. Although the Court has found that Gonzalez's consent was involuntary after weighing and balancing the six factors, it is a close call. The contours of the law are not so clearly established that it would have been clear to a reasonable officer that the

conduct of Deputies Rivera and Garcia was unlawful in the situation they confronted. The *Zavala* case, discussed above, is the factually closest Fifth Circuit opinion identified by the Court, yet even that opinion is unpublished and therefore is not a basis for "clearly established law." *See Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (clearly established law is "controlling authority—or a robust consensus of persuasive authority."). This was not such an obvious or egregious example of coercion that the deputies had fair notice that their conduct violated clearly established law against coercing consent to search a vehicle. Gonzalez failed to meet his burden to show that Deputies Rivera and Garcia violated clearly established law by obtaining his consent to search his vehicle.

Next, the Court considers whether Deputies Rivera and Garcia violated clearly established law by reading and photographing the pages of Gonzalez's notebook that they found during the search. Gonzalez states that the two deputies "communicated … that he was suspected of illegally smuggling people and/or narcotics," and that examining the notebook exceeded the scope of consent. (Dkt. No. 56 at 9). In support of his argument that the deputies violated Gonzalez's clearly established right in the context of the events of October 19, 2022, he cites *United States v. Perry*, 95 F. App'x 598, 602 (5th Cir. 2004). In *Perry*, the court held that under the "plain view doctrine," officers' entry onto a suspect's property and a seizure of a clipboard and marijuana plants was constitutional. But the facts of *Perry* do not involve the purported consent to search the property, which is at issue in the present case, and therefore does not define clearly established law for the circumstances of this case. Gonzalez also cites a Sixth Circuit case for the proposition that "officers may not read documents when conducting a search if they must be read in order for their incriminating nature to be determined." (Dkt. No. 65 at 22) (citing *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007)). However, *Garcia* likewise involved a seizure under the plain view doctrine—not a consent to search of an automobile. Furthermore, a single case from the Sixth Circuit is not sufficient to determine clearly established law in the Fifth Circuit.

For over thirty years, it has been settled law that a suspect may limit the scope of his consent. If his consent would reasonably be understood to extend to a particular container, the Fourth Amendment does not require a more explicit authorization. *Florida*

*v. Jimeno*, 500 U.S. 248, 252 (1991). Gonzalez did not limit or qualify his consent during the search when he saw the officers reading and photographing the notebook. Thus, Deputies Rivera and Garcia acted objectively reasonably under the facts alleged by Gonzalez in his complaint, and they are entitled to qualified immunity on this claim.

Gonzalez has not met his burden to overcome Defendant Deputies Rivera and Garcia's assertions of qualified immunity as to the October 19, 2022, search. Therefore, those claims will be dismissed.

### 2. Deputy Martinez's Encounter with Gonzalez on May 25, 2023

Gonzalez asserts that on May 25, 2023, five months after he sued the Sheriff, Defendant Deputy Martinez (1) impermissibly seized him, and (2) impermissibly searched his vehicle during another nighttime encounter. (Dkt. No. 56 at 46). Although Deputy Martinez told Gonzalez that he was apprehended for failing to come to a complete stop at an intersection, Gonzalez disputes that he committed the traffic violation and that the stop was done in retaliation for suing the Sheriff. (*Id.*) Gonzalez alleges that after twice telling Deputy Martinez that he did not consent to a search, "the officers needed to ticket Gonzalez and leave, but they did not." (*Id.* at 47). He states that "for [a] half-an-hour Deputy Martinez repeatedly insisted that Gonzalez 'consent' to a vehicle search in order to get on with his night." (*Id.* at 47). Gonzalez eventually did consent. (*Id.* at 32). Deputy Martinez searched the vehicle for another half-an-hour and, finding nothing, left the scene without issuing Gonzalez a ticket or written warning. (*Id.* at 47). Defendant Martinez argues that Gonzalez has not sufficiently pled any Fourth Amendment violations. (*Id.*) At issue is whether Gonzalez has sufficiently pleaded that Deputy Martinez conducted an illegal traffic stop and search in violation of the Fourth Amendment, including whether Gonzalez's consent to search was voluntarily given.

First, the Court finds that Gonzalez has plausibly alleged that Deputy Martinez effectuated an unconstitutional seizure on May 25, 2023. Gonzalez asserts that after the unmarked police car flashed its lights, signaling for Gonzalez to pull onto the shoulder, "four or five additional Zapata County sheriff vehicles, including a K-9 unit, swarmed in from different directions." (*Id.*) Gonzalez was only able to identify Defendant Deputy Martinez because he "handled the entire interaction with him that night." (*Id.*) However, Deputy Martinez argues that "Plaintiff does not plead that Defendant Martinez actually

stopped or pulled him over at all. He merely alleges that Martinez appeared on the scene." (Dkt. No. 75 at 4) (internal citation omitted). Gonzalez contends that he "is not omniscient and does not know which police vehicle of the four or five on the scene first had emergency lights engaged," but Deputy Martinez was "the first and only cop to approach Plaintiff's truck and interact with him that night." (Dkt. No. 76 at 1–2). The Court finds that for all intents and purposes, Deputy Martinez conducted the traffic stop during the May 25, 2023, encounter.

Gonzalez makes a facially plausible claim that the stop constituted an unconstitutional seizure. Temporary detention of a person during a traffic stop constitutes a Fourth Amendment seizure of persons. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *see United States v. Shabazz*, 993 F.2d 431, 434–35 (5th Cir. 1993) (stating that a routine traffic stop is a limited seizure, analogous to a *Terry* stop or investigative detention.). A brief and limited traffic stop must be reasonable under the circumstances. *Id.* at 810. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* (citations omitted). The constitutional reasonableness of traffic stops does not depend on the actual motivations of the individual officers involved. *Id.* at 813. But an officer may not stop a person based solely on an "inchoate and unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. 1, 27 (1968) (internal quotation omitted).

Here, Gonzalez was pulled over for allegedly failing to stop at a stop sign. (Dkt. No. 56 at 31). Gonzalez alleges that he did come to a complete stop. (*Id.*). He presumes that the Sheriff's deputies "had grown impatient in following Plaintiff and fabricated this minor traffic offense in hopes of searching his vehicle." (Dkt. No. 65 at 23–24). In his motion to dismiss, Defendant Martinez justifies the stop because Gonzalez was driving in Zapata County, near the international border. However, as discussed in Part III.A.1, *supra*, this is a misstatement of the Fourth Amendment's "border search" exception.

At this stage of the proceedings, there is no independent evidence of the traffic stop and Defendants have not alleged an alternative basis for the stop. Therefore, the Court must accept Gonzalez's non-conclusory factual allegations as true. Since Gonzalez has pleaded that he did not commit the traffic infraction and he was neither cited nor ticketed, it is plausible that Deputy Martinez had neither reasonable articulable

suspicion of criminal activity nor probable cause for a traffic violation to justify the May 25, 2023, traffic stop. *See, e.g.*, *Herrera v. Acevedo*, No. 21-20520, 2022 WL 17547449 (5th Cir. Dec. 9, 2022).

Furthermore, Deputy Martinez is not entitled to qualified immunity for stopping Gonzalez without reasonable suspicion or probable cause, as pleaded by Gonzalez. It is clearly established law that officers must have reasonable, articulable suspicion of criminal activity to justify a *Terry* stop. 392 U.S. at 21. It is also clearly established that if an officer stops a motorist for an alleged traffic infraction, the officer must have probable cause to believe that the traffic violation occurred. *Whren*, 517 U.S. at 810. As pleaded by Gonzalez, Deputy Martinez's interaction with Gonzalez was objectively unreasonable.

Gonzalez next challenges the legality of the subsequent search of his vehicle after he was stopped by Deputy Martinez. Gonzalez argues that although he consented to a search, the consent was not voluntary. As discussed in Part III.A.1, *supra*, the Court must weigh six factors in determining voluntariness of consent: (1) the voluntariness of the suspect's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the suspect's cooperation with police; (4) the suspect's awareness of his right to refuse consent; (5) the suspect's education and intelligence; and (6) the suspect's belief that no incriminating evidence will be found. *See e.g.*, *Galberth*, 846 F.2d at 987. Regarding the second factor, coercive police procedures include "threats of force, promises, trickery, or deceit designed to pressure a suspect into consenting to searches or more subtle forms of coercion that may flaw his judgment." *Alkheqani*, 78 F.4th at 720.

Compared to the October 2022 encounter, it is less clear that Gonzalez has sufficiently alleged that his consent was coerced or involuntarily given on May 25, 2023. Gonzalez has plausibly pleaded that he was involuntarily detained. Gonzalez also alleges that he was twice unwilling to give his consent but agreed to the search once he "understood that he was not going anywhere." (Dkt. No. 56 at 32). Gonzalez does not allege any facts about whether he knew he was free to decline the search. Nor does he plead facts about his education or intelligence. Based on the allegation that the officers left the scene of the encounter without issuing Gonzalez a citation or even a warning, it is reasonable to infer that no incriminating evidence was found.

Finally, regarding the coercive police tactics factor, Gonzalez does not plead that he was threatened, promised anything, or tricked by Deputy Martinez. Nor does he plausibly plead facts showing that deputies used coercive force. Gonzalez pleads that at least "four or five additional Zapata County sheriff vehicles, including a K-9 unit, swarmed in from different directions." Yet he states that only one deputy—Deputy Martinez—interacted with him throughout the encounter. He does not allege that he was surrounded by deputies with their guns drawn, or any other examples of coercive shows of force. *See Alkheqani*, 78 F.4th at 720 (finding that multiple officers having guns drawn surrounding the defendant during a traffic stop and ordering the occupants from the vehicle ultimately weighed in favor of voluntariness when the officers spoke to defendant one on one in a polite tone).

In summary, in support of his allegation of coerced consent to search, Gonzalez pleads that he was stopped by deputies purportedly because he committed a rolling stop, which he disputes. The deputies asked him twice if he would consent to a search, which he refused. He had been there for approximately 30 minutes and was under the impression that he would not be allowed to leave unless he consented to a search. He does not plead conduct by the deputies that rises to the level of being coercive police procedures. Although there were multiple police vehicles present, he alleges that only one deputy approached and spoke to him. *See, e.g., United States v. Martinez*, 410 F. App'x 759, 764 (5th Cir. 2011) ("[T]he mere presence of armed officers does not render a situation coercive."); *see also United States v. Jones*, 475 F.2d 723, 724, 730 (5th Cir. 1973) (holding that defendant's statement was not coerced even though approximately ten FBI agents were present). He does not allege that the officers had their weapons drawn or pointed at him. Nor does he allege that any officer yelled at or threatened him. *See Martinez*, 410 F. App'x at 764 (noting lack of coercion when officers "were not pointing their firearms at anyone and were not threatening [defendant] or shouting"); *United States v. Mata*, 517 F.3d 279, 283 (5th Cir. 2008) (no coercion where officers did not have their weapons drawn and did not yell at or threaten the defendant); *United States v. Mendez*, 431 F.3d 420, 430 n.4 (5th Cir. 2005) (no coercion where officers did not use any threats or draw their weapons).

And regardless of whether Gonzalez's consent was involuntary, Deputy Martinez's

search pursuant to the consent given by Gonzalez at the time of the incident did not violate clearly established law regarding the consent to search. Despite the initial traffic stop being unconstitutional, Gonzalez does not identify any clearly established law to overcome Deputy Martinez's assertion of qualified immunity on this point. To overcome qualified immunity, Gonzalez would need to identify controlling authority, or a robust consensus of persuasive authority that speaks to the particular facts of this case, such that a reasonable Sheriff's deputy would be on notice that his conduct is unconstitutional. *See Morgan*, 659 F.3d at 371–72; *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008). When the law at issue involves a multi-factor test, as is the case here, courts are more likely to find a violation of clearly established law when the plaintiff cites to cases that analyze the factors similarly. *See Cooper v. Flaig*, 799 F. App'x 269, 271 (5th Cir. 2019) (per curiam) (reversing a district court's denial of qualified immunity on summary judgment in a case involving the *Graham v. Connor* excessive force factors); *see also White v. Pauly*, 580 U.S. 73, 80 (2017) (per curiam) (holding that an officer does not violate clearly established law when the case presents a unique set of facts and circumstances). Here, there was no clearly established law prohibiting a reasonable officer who conducts a thirty-minute traffic stop vehicle for a purported traffic violation[3] from asking the driver for consent to search three times while other officers are in their nearby in their cars.

Based on the totality of the circumstances considering the facts pleaded by Gonzalez and viewed in the light most favorable to him, Gonzalez has failed to sufficiently plead that his consent was involuntarily given. Accordingly, Gonzalez has alleged sufficient facts that Deputy Martinez conducted an unconstitutional traffic stop, but he has failed to sufficiently plead that his subsequent consent to search was involuntary.

For the foregoing reasons, Deputy Martinez is not entitled to qualified immunity based on the initial traffic stop of May 25, 2023. But he is entitled to qualified immunity on Gonzalez's claim that the subsequent search of his vehicle was unconstitutional.

---

[3] The Court reiterates that at this stage in the proceedings, Plaintiff has plausibly alleged that deputies stopped him without probable cause or reasonable suspicion, despite Defendants' assertion the stop was for a traffic violation.

> 3. *Liability of Sheriff Del Bosque, Executive Chief Peña, and Zapata County for Fourth Amendment Claims*

Gonzalez asserts that all Defendants, including Del Bosque, Peña and Zapata County, are directly liable for any Fourth Amendment violations arising from the traffic encounters of October 2022 and May 2023, independent of a conspiracy claim and a *Monell* claim separately asserted against these Defendants. (Dkt. No. 56 at 43). The Court determines that all the facts pleaded by Gonzalez purporting to connect Defendants Sheriff Del Bosque and Executive Chief Peña to any Fourth Amendment violations are conclusory. Gonzalez does not allege that Sheriff Del Bosque and Executive Chief Peña were present at either traffic stop. As to the first encounter in October 2022, Gonzalez alleges that only Deputies Rivera and Garcia are liable. (Dkt. No. 56 at 42; Dkt. No. 65 at 24–25). However, Gonzalez's Fourth Amendment claim against Sheriff Del Bosque as final policymaker for Zapata County overlaps with his conspiracy claim, discussed in Part III.D, *infra*. He alleges that the second encounter in May 2023 "was an attempt led by the Sheriff himself to humiliate and run off Gonzalez as retaliation for filing this suit against him." (Dkt. No. 56 at 42). He concludes, "only the Sheriff or a second-in-command would have the authority in Zapata County to order such organized harassment and intimidation of Gonzalez." (*Id.*). Without offering more, Gonzalez's claims against Sheriff Del Bosque and Zapata County are bare allegations. (*Id.* at 48). ("Because it is plausible (and nearly certain) that the Sheriff as a final policymaker directly ordered and/or approved this harassment of Gonzalez, Zapata County is liable for the unconstitutional actions of these deputies under *Monell*.").

Since there is no plausible claim against Sheriff Del Bosque as the policymaker for the County, there is no plausible claim against Zapata County. Therefore, Defendant Sheriff Del Bosque, Defendant Zapata County, and Defendant Executive Chief Joe Peña's motions to dismiss Gonzalez's Fourth Amendment claims against them are granted.

## B. Gonzalez's Fourteenth Amendment "Stigma-Plus-Infringement" Claim

Gonzalez asserts a 1983 claim against Sheriff Del Bosque, Executive Chief Peña, and Zapata County for violation of his Fourteenth Amendment rights. (Dkt. No. 56 at 36–40). The claim as asserted in the Second Amended Complaint seems to allege independent violations of the Fourteenth Amendment for developing and enforcing

policies of making false accusations of being a human smuggler, making improper disclosure of confidential personal information, and conducting warrantless searches and seizures without probable cause. (*Id.* at 38). The pleadings further assert, "In bringing his constitutional claim, Gonzalez *also* pleads both (1) a 'stigma,' that is, that a false and injurious statement has been made; and (2) a 'plus factor,' that is, that Plaintiff suffered 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" (*Id.* at 38–39) (emphasis added). Accordingly, Gonzalez seems to assert a "stigma-plus" claim under the Fourteenth Amendment in addition to the other three independent Fourteenth Amendment violations.

However, in response to Defendants' motions to dismiss, Gonzalez refers to his Fourteenth Amendment claim as the stigma-plus claim, with the other alleged policy violations serving as alternate "infringement" elements of the stigma-plus claim. (*See* Dkt. No. 65 at 25–37). At no point in Gonzalez's response does he claim to be asserting any Fourteenth Amendment claim other than the stigma-plus claim. Accordingly, Gonzalez's Fourth Amendment claim will be analyzed exclusively as a stigma-plus claim.

In support of his Fourteenth Amendment stigma-plus claim, Gonzalez alleges that Sheriff Del Bosque and Executive Chief Peña, in their individual capacities, falsely labeled him as a "known human smuggler" and a "scout" in a BIAR report that they sent to the newspaper editor. (*See* Dkt. No. 56 at 13–14; Dkt. No. 65 at 26). Gonzalez alleges that the defamation occurred in connection with a violation of his Fourth Amendment rights. (Dkt. No. 56 at 39); *Paul v. Davis*, 424 U.S. 693, 711–12 (1976). He also alleges defamation in connection with a deprivation of a property interest through violation of state and federal statutes that create a privacy interest in Gonzalez's driver's license information. (Dkt. No. 56 at 5–6); *see San Jacinto Sav. & Loan*, 928 F.2d at 701.

As a threshold inquiry into Gonzalez's Fourteenth Amendment claims, he must identify a protected life, liberty, or property interest, and show that the government deprived him of that interest without due process of law. *E.g.*, *id.* at 700. One's reputational integrity is not a cognizable liberty or property interest. *Paul*, 424 U.S. at 712. Thus, injury to reputation alone is not sufficient for recovery under Section 1983 unless the state infringes upon a "more tangible" interest in connection with the defamation. *See id.* at 712; *see also Marrero v. City of Hialeah*, 625 F.2d 499, 512 (5th Cir.

1980).

To prove reputational harm, a plaintiff must show that the stigma was caused by a state actor making a concrete, false assertion of wrongdoing about the plaintiff. *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995) (citations omitted); *see also Marrero*, 625 F.2d at 516.

A defamatory communication that is made in connection with, and is reasonably related to, the loss of a protected right satisfies *Paul*'s stigma-plus requirement. *See Marrero*, 625 F.2d at 519. To be clear, "the defamatory communication need not cause the loss of the protected right, or more tangible interest, in order to satisfy the stigma-plus requirement of *Paul*." *Id.* If defamation occurs *in connection with* an alleged constitutional violation, the injury to a defendant's reputation constitutes deprivation of a liberty interest. *Id.* Once a plaintiff establishes a liberty or property interest, he must also show that interest was deprived without due process. *Id.* As stated above, Gonzalez has pleaded several violations of property interests, including making improper disclosure of confidential personal information and conducting warrantless searches and seizures without probable cause. (Dkt. No. 56 at 38). The Court construes these to be allegations that these interests were deprived without due process in support of his stigma-plus claim rather than as independent claims.

Here, Gonzalez has sufficiently alleged that he is not a "known human smuggler," and that this false statement was published. Gonzalez alleges that he does not have a criminal record of any human smuggling-related offenses. (Dkt. No. 56 at 8, 22). He alleges that he was falsely accused of criminal human smuggling and working as a scout for criminal organizations. (*Id.* at 38). Gonzalez states that after the news story was published, Executive Chief Peña called Gonzalez's mother and admitted that the BIAR arose "from a collection of suspicions" compiled by the Sheriff's Department. (*Id.* at 24). The newspaper subsequently published a retraction of the story. Therefore, Gonzalez has plausibly stated a claim that the newspaper article was defamatory.

Defendants contend that the stigmatizing statements did not have a sufficient causal connection to either the October 2022 or May 2023 searches of Gonzalez's truck. (Dkt. No. 59 at 6). Defendants misstate the standard for stigma-plus-infringement. They incorrectly argue that the defamation must *cause* the denial of a protected liberty

interest. The standard is not causation. Defamation need only occur in connection with and be reasonably related to a violation of a protected right. *Marrero*, 625 F.2d at 519. In *Marrero*, "the defamation did not cause the violation of appellants' [F]ourth [A]mendment rights; however, the public surely perceived the defamatory statements made by the police … to be connected to the … search and seizure." *Marrero*, 625 F.2d at 519.

Defendants also mischaracterize the holdings of two Fifth Circuit cases that distinguish *Marrero*. Defendants point to *Brown v. Manning*, where the court held that the plaintiffs lacked standing for their Fourth Amendment claims. 244 F.3d 133, 133 (5th Cir. 2000) ("*Marrero* is distinguishable because in that case, the search and seizure was allegedly conducted in violation of the plaintiffs' Fourth Amendment rights, not those of a third[-]party customer, as in the instant case."). Defendants also cite *Bradford v. Bronner*, a case involving unlawful termination and defamation—not any Fourth Amendment violations. 665 F.2d 680, 682–83 (5th Cir. 1982). There, the court held that defamatory comments made by plaintiff's supervisors did not cause his dismissal or a loss of business goodwill. *Id.*

Here, as in *Marrero*, the Court finds a sufficient nexus between the violation of Gonzalez's Fourth Amendment rights on October 19, 2022, and the defamatory newspaper article.[4] The fact that Deputies Rivera and Garcia, the officers who conducted the unlawful search and seizure, and Executive Chief Peña, the person who caused the defamatory article to be published, are part of the same law enforcement entity is sufficient to show a causal nexus. Gonzalez has pled sufficient facts showing that Deputy Rivera wrote the BIAR record using information acquired in connection with an unconstitutional search and seizure. Gonzalez has also sufficiently alleged that Executive Chief Peña emailed the BIAR to editor Westerman.

Gonzalez also alleges sufficient facts showing that Sheriff Del Bosque had a role in causing the article to be published. In editor Westerman's declaration, she states that it was difficult to receive news from the Sheriff's department before Del Bosque took office

---

[4] On the contrary, the Court does not find a similarly sufficient connection between the newspaper article and the alleged Fourth Amendment violations of May 25, 2023. Accordingly, his stigma-plus claim based on the infringement of a Fourth Amendment violation in May of 2023 will be dismissed for that reason.

in 2020. (Dkt. No. 56 at 55).[5] When Gonzalez's mother confronted Westerman, asking her whether Del Bosque or Peña gave her the published information, Westerman responded "Well, it's through both of them." (*Id.* at 13.) Further, Westerman stated in her affidavit that:

> "The way the Sheriff shares media stories is through Chief Joe Pena, who functions as the Sheriff's media liaison and public information officer.  Chief Pena is my normal contact for weekly stories.  **I was told during conversations with the Sheriff and Joe Pena that Chief Pena works closely with the Sheriff and releases approved stories in an approved manner.**"

(*Id.* at 14) (emphasis added). Additionally, Westerman stated that "Chief Peña explained to me that it is the official position of the Sheriff's Office that all BIAR records are public records as defined by the TPIA." (*Id.* at 18). Westerman also states that Executive Chief Peña "functions as the Sheriff's media liaison and public information officer." (*Id.*). Thus, Gonzalez has a facially plausible stigma-plus claim against Defendants Peña and Del Bosque based on the defamation plus infringement of Gonzalez's Fourth Amendment rights in October 2022.

Gonzalez has also shown that Sheriff Del Bosque and Executive Chief Peña's conduct of publishing the defamatory statement in connection with the October 2022 Fourth Amendment violation, without giving Gonzalez notice and an opportunity to be heard, was a violation of his Fourteenth Amendment due process rights under clearly established law, relying on *Marrero*, a published Fifth Circuit opinion from 1980. *See Boyd*, 74 F.4th at 667 (citing *City of Tahlequah*, 595 U.S. at 11 ("An official violates clearly established law if 'then-existing precedent' establishes that the officer's conduct constituted a constitutional violation.")).  *Marrero* is sufficiently factually similar to this case.  Here, as in *Marrero*, law enforcement searched the plaintiff's property and released false information to the media. *Marrero*, 625 F.2d at 502. Police officers, accompanied by

---

[5] The Court considers the non-conclusory, factual portions of Westerman's declaration as part of the pleadings since the declaration is attached as an exhibit to Plaintiff's Second Amended Complaint. (Dkt. No. 56-1). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). "For Rule 12(b)(6) motions, a district court may only consider the allegations in the complaint and any attachments." *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003). Also, "whether the statements...might constitute inadmissible hearsay when relied upon for the truth of the matters asserted is simply irrelevant" in a motion to dismiss. *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 235 (E.D.N.Y. 2010).

an assistant state attorney, executed a search warrant on a jewelry store. *Id.* The attorney and the police department did not recover any of the items listed in the warrant. *Id.* They brought robbery victims to the store to attempt to identify stolen items. *Id.* However, only a single bracelet was recognized by a member of the public and the seized property was returned to them. *Id.* The officers proceeded to improperly seize almost the entire stock of jewelry in the store and arrest the store owner in violation of the owner's Fourth Amendment rights. The assistant state attorney subsequently made the false announcement to the media "that over $75,000 in stolen property had been recovered." *Id.* The owner was not afforded the "rudimentary elements of due process" of notice and the opportunity to be heard. *Id.* at 520. As such, the Fifth Circuit recognized that the plaintiff had sufficiently pleaded a violation of Fourteenth Amendment rights for stigma-plus infringement in connection with a violation of Fourth Amendment rights.

The stigma-plus claim under such a similar factual scenario to this case survived. *Id.* at 516. Therefore, it is clearly established in the Fifth Circuit that it is unconstitutional for public officials to "issue false and defamatory statements about a citizen in connection with an unlawful arrest or search and seizure" without providing a person notice and an opportunity to be heard *Id.* at 519–20. Since established precedent clearly established that this conduct was unconstitutional, Gonzalez's pleadings are sufficient to overcome Sheriff Del Bosque and Executive Chief Peña's assertions of qualified immunity as to the 1983 claim for a stigma-plus violation of the Fourteenth Amendment based on the defamatory statement and the October 2022 Fourth Amendment violation.

Gonzalez also alleges in the alternative that Defendants Del Bosque and Peña defamation was made in connection with the infringement of Gonzalez's common law, statutory, and constitutional privacy interests. (Dkt. No. 56 at 39). However, Gonzalez has failed to overcome Defendants Del Bosque and Peña's assertions of qualified immunity on this variation of his stigma-plus claim because he has failed to show that Defendants Del Bosque and Peña's alleged defamation in connection with a violation of his common law, statutory, and constitutional privacy interests was a violation of clearly established law. Gonzalez has failed to point to any "then-existing precedent" that this type of stigma-plus Fourteenth Amendment violation was clearly established.

Accordingly, Gonzalez has failed to overcome Defendants Del Bosque and Peña's assertions of qualified immunity on this stigma plus claim based on the infringement of a violation of Gonzalez's common law, statutory, and constitutional privacy interests.

For the foregoing reasons, Defendant Sheriff Del Bosque and Defendant Executive Chief Peña's motions to dismiss Gonzalez's Fourteenth Amendment stigma-plus-infringement claim will be denied in part and granted in part.

### C. *Monell* Liability Against the County

Gonzalez also asserts a claim against Zapata County for municipal liability pursuant to *Monell v. Department of Social Services*, arguing that the County approved and ratified two unconstitutional policies. 436 U.S. 658, 694–95 (1978). First, Gonzalez alleges that the County had a policy permitting the media to publicize internal police records containing confidential information. (Dkt. No. 56 at 36). Gonzalez states that in furtherance of the second policy, County officials directed and encouraged the newspaper editor to publish the October 27, 2022, newspaper article "Cruising Around to Find Illegals." (*Id.* at 37). Second, Gonzalez alleges that the County directed law enforcement personnel to seize and search Gonzalez as retribution for filing suit. (*Id.* at 37).

Under Section 1983, a municipality is not vicariously liable for the wrongdoing of its employees. *Monell*, 436 U.S. at 691. Instead, a municipality or local government is liable under Section 1983 if one of its customs or official policies deprives a plaintiff of their constitutional rights. *Id.* at 690–91. To state a *Monell* claim, Gonzalez must plead facts that establish: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose "moving force is the policy or custom." *Pitrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001), *cert. denied*, 534 U.S. 820 (2001); *see also Monell*, 436 U.S. at 694. A county may be liable under Section 1983 for a policymaker's single decision to take unlawful action only where the policymaker deliberately chooses to follow that course of action among various alternative options. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Section 1983 also protects against deprivations of both constitutional and statutory rights. *See, e.g.*, *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x. 194 (3d Cir. 2018).

In Texas, a county sheriff is the county's final policymaker in the area of law enforcement. *E.g.*, *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 448 (5th Cir. 2019)

(quoting *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990)). A county may be liable for the unconstitutional acts of its sheriff in two ways. First, the sheriff is deemed to have made a policy or custom by ratifying the illegal actions of subordinate officers or employees. *See Turner*, 915 F.2d at 136. Second, a county may be liable for the illegal or unconstitutional acts of its sheriff as the sheriff sets goals and determines how those goals will be achieved. *See id.* (citing *Pembaur*, 475 U.S. at 483). "The fact that a … policymaking official has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481–82.

Regarding the first alleged policy, the County's publishing of confidential information contained in the BIAR report, Gonzalez has stated sufficient facts to show that Sheriff Del Bosque, as the County's final policymaker, made "a deliberate choice to follow a course of action … made from among various alternatives," and so his claim for municipal liability survives. *Pembaur*, 475 U.S. at 483. As discussed in Part III.B, *supra*, Gonzalez has plausibly alleged a Fourteenth Amendment stigma-plus claim, including allegations that Del Bosque discussed with Westerman the policy of releasing information such as the BIAR report. He worked with Peña to ensure that this information was disseminated to the newspaper. These facts are sufficient to plead that Sheriff Del Bosque set the policy of the Department and worked with Peña to release confidential information to the press.

However, Gonzalez has not sufficiently pleaded a claim based on the second alleged policy, Sheriff Del Bosque's plan to harass and intimidate Gonzalez as retaliation for filing suit. Gonzalez spends much time in his complaint and response speculating about the Sheriff's political ambitions. His legal argument veers off into conjecture about the Sheriff's reelection campaign. Gonzalez quotes conversations and text messages without citations to the sources. Inexplicably, Gonzalez argues that Sheriff Del Bosque's causing the defamatory news article to be published in October 2022 was done in furtherance of his policy to "harass, defame, and intimidate Plaintiff" in May 2023. (Dkt. No. 56 at 37). Gonzalez does not allege any non-conclusory facts anywhere in the live complaint that Defendant Del Bosque, as final policymaker for the Defendant County, ratified a retaliation plan by his subordinates, or retaliated in furtherance of his

reelection campaign. *See Turner*, 915 F.2d at 136.

Therefore, Defendant Zapata County's motion to dismiss Gonzalez's Fourteenth Amendment *Monell* claim will be granted in part and denied in part.

### D. Gonzalez's Conspiracy Claim

Gonzalez alleges that all Defendants conspired to deprive his constitutional rights under 42 U.S.C. § 1983.

To support a conspiracy claim, a plaintiff must allege facts that suggest (1) an agreement to commit an illegal act and (2) an actual deprivation of constitutional rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994); *see also Pfannstiel*, 918 F.2d at 1187 (stating that in order to prevail on a Section 1983 conspiracy claim, plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy) *abrogated on other grounds by Martin v. Thomas*, 973 F.2d 449 (5th Cir. 1992). "[C]onspiracy-to-violate-§ 1983 allegations, unsupported by sufficient factual content, are insufficient to state a plausible claim for relief." *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019). Furthermore, a plaintiff must plausibly allege an actual violation of Section 1983 because "'a conspiracy claim is not actionable without an actual violation of section 1983.'" *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (quoting *Pfannstiel*, 918 F.2d at 1187.

First, Gonzalez claims that the newspaper and its publisher defamed him and violated his privacy interests as part of a conspiracy with the Zapata County Sheriff's Department. (Dkt. No. 56 at 42). A non-state actor can be part of a conspiracy to violate Section 1983 if "the citizen conspired with or acted in concert with state actors." *Mylett v. Jeane*, 879 F.2d 1272, 1275 (5th Cir. 1989). Gonzalez has pleaded enough facts to show that Del Bosque and Peña conspired to violate his Fourteenth Amendment rights. Westerman declared that "both of them" released confidential information to her. (Dkt. No. 56 at 13). Westerman also stated that "Chief Peña works closely with the Sheriff and releases approved stories in an approved manner." (*Id.* at 14). Since Del Bosque is a policymaker for Zapata County, the county can be held liable for his deliberate choices. *See Pembaur*, 475 U.S. at 483.

Gonzalez also alleges a conspiracy to violate his Fourth Amendment rights in the two traffic encounters. (Dkt. No. 56 at 42). He has not alleged sufficient facts about the

existence of a conspiracy. He simply states "[n]o reasonable official would have so unlawfully, willingly, recklessly and/or arbitrarily conspired to deprive Gonzalez of his constitutional rights" and "[o]nly the Sheriff or a second-in-command would have the authority in Zapata County to order such organized harassment and intimidation." (*Id.*). These are conclusory statements that do not allege any specific facts needed to properly plead a conspiracy claim. Thus, Gonzalez fails to meet the standards set forth in *Cinel* and *Pfannstiel*.

Zapata County, Sheriff Del Bosque, Executive Chief Peña, and Deputies Rivera, Garcia, and Martinez's motions to dismiss Gonzalez's conspiracy claim will be granted as to the conspiracy to violate his Fourth Amendment rights but Zapata County, Del Bosque, and Peña's motion to dismiss the conspiracy claim as to his Fourteenth Amendment rights will be denied.

### E. Gonzalez's Driver's Privacy Protection Act Claim

Gonzalez alleges that Sheriff Del Bosque and Executive Chief Peña violated the DPPA by disclosing his driver's license information and identity to the newspaper. (Dkt. No. 56 at 25). Although this information was not published, it was still disseminated to a private citizen.

The Driver's Privacy Protection Act (DPPA) prohibits the release and use of certain personal information from state motor vehicle records. 18 U.S.C. § 2721. Specifically, the DPPA prohibits "[a] State department of motor vehicles, and any officer, employee, or contractor thereof," from releasing and using personal information obtained by the department in connection with a motor vehicle record. *Id.* at (a)(1). Further, the "DPPA establishes several penalties to be imposed on States and private actors that fail to comply with its requirements." *Reno v. Condon*, 528 U.S. 141, 146 (2000). 18 U.S.C. § 2724(a) creates a civil cause of action against any "person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter." A court may award actual damages, punitive damages, attorney's fees, and other appropriate relief. *Id.* at (b)(1–4).

Gonzalez alleges that Zapata County Sheriff's Department officials documented his driver's license information in the October 19, 2022, BIAR report, and shared that unredacted report with the newspaper in violation of the DPPA. (Dkt. No. 56 at 1–2).

However, Defendants argue that the DPPA only regulates information obtained from a state department of motor vehicles ("DMV") database—not reports created by sheriff's departments. (Dkt. No. 57 at 16). Defendants assert that Deputy Rivera obtained Gonzalez's information from observations he made at the scene, and not by accessing a state DMV database. (*Id*.; *see also* Dkt. No. 56 at 10, 20). In summary, the issue before the Court is whether a Texas sheriff or deputy violates the DPPA when they encounter a person, take the person's driver's license number, date of birth, and license plate information; put that information into a BIAR report; and then share that BIAR report with a private citizen. This is an issue of first impression.

Gonzalez highlights Texas's unique approach to managing motor vehicle information. (Dkt. No. 65 at 39). In most states, driver's licenses are issued and maintained by the state's DMV. Although Texas has a freestanding DMV, the Department of Public Safety ("DPS") issues and manages driver's licenses. *List of Divisions*, Tex. Dep't. of Pub. Safety, https://perma.cc/9KRJ-4P4K (last visited Sep. 16, 2024) Gonzalez acknowledges that although DPS is not a DMV agency by name, it serves the same functions as a traditional DMV. (Dkt. No. 65 at 39). Therefore, Gonzalez argues, because Sheriff Del Bosque and Executive Chief Peña work under the DPS umbrella, they are "officer[s], employee[s], or contractor[s]" of Texas's driver's license administration agency and are thus liable under the DPPA. (*Id*.). Gonzalez argues that since the published BIAR record is a confidential DPS document, Sheriff Del Bosque and Executive Chief Peña are liable under the DPPA for sharing the BIAR with the media. (Dkt. No. 56 at 5).

The Texas Government Code establishes the DPS as an agency of the state that is composed of different departments. Tex Gov't. Code Ann. § 411.002 (West 2013). There are three major classes of functional department programs within the DPS: (1) police law enforcement function, (2) administrative and regulatory function, and (3) staff support and supplement functions. 37 Tex. Admin. Code § 1.3 (2003) (Tex. Dep't of Pub. Safety). However, the Administrative Code lists "driver's license services" as a function of both the police law enforcement and the administrative and regulatory departments. *See* 37 Tex. Admin. Code § 1.3(b)(1)(B) (2003) (Tex. Dep't of Pub. Safety); *see also* at § 1.3(b)(2)(A). Each county's sheriff and constables are associate members of the DPS who

are entitled to full rights and privileges of the DPS. Tex. Govt. Code. Ann. § 411.009 (West 2023). The DPS Driver's License division issues driver's licenses in the state. *See* Tex. Transp. Code Ann. § 521.141 (West 2023); *see also List of* Divisions, Tex. Dep't. of Pub. Safety, https://perma.cc/9KRJ-4P4K (last visited Sep. 16, 2024).

Furthermore, a Texas Attorney General Opinion agrees that "the DPPA applies to Texas driver's license information in the possession of the DPS." Tex. Att'y Gen. Op. No. JC-0499 (2002). While the statute nominally refers to a "department of motor vehicles," it uses the term "motor vehicle record" to include "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." *Id.* (citing 18 U.S.C. § 2725(1)). The Attorney General's opinion is not binding, but it is persuasive. *In re Smith¸* 333 S.W.3d 582, 588 (Tex. 2011).

Gonzalez has not shown that the BIAR report itself is confidential, but some information contained in the report is protected by the DPPA. He therefore has plausibly alleged that Del Bosque approved Peña's release of the information to Westerman in violation of the DPPA. *See* (Dkt. No. 56 at 13, 14, & 18).

Zapata County can be held liable for Del Bosque and Peña's violations of the DPPA. The DPPA provides a cause of action against any "person who knowingly obtains, discloses, or uses" personal information from motor vehicle records. 18 U.S.C. § 2724(a). The statute later defines "person" as "an individual, organization or entity, but does not include a State or agency thereof." *Id.* at § 2725(2). In Texas, a state agency is defined in relevant parts as "a department, commission, board, office, or other agency that: (i) is in the executive branch of state government; (ii) has authority that is not limited to a geographical portion of the state; and (iii) was created by the Texas Constitution or a statute of this state." Tex. Gov't Code Ann. § 572.002(10) (West 2013). Therefore, Zapata County is not a state agency and can be sued under the DPPA.

Zapata County argues that the statute allows for the release of information for law enforcement purposes. *See* 18 U.S.C. § 2721(b)(1); (Dkt. No. 57 at 16–17). However, Zapata County does not state what the law enforcement purpose for this release was. Gonzalez had not been arrested, charged, or even cited. Just the fact that the release was made by law enforcement personnel does not *ipso facto* make the release for a law

enforcement purpose. Zapata County certainly fails to assert a legitimate law enforcement purpose that is served by releasing the information to a newspaper reporter in this situation. Therefore, Gonzalez has sufficiently pleaded that Zapata County can be held liable for Sheriff Del Bosque's decision to engage in "substantial noncompliance" with the DPPA. 18 U.S.C. § 2723(b).

As this is a novel issue, Gonzalez has plead sufficient facts to raise the question of whether the Sheriff's Department falls within the definition of a department of motor vehicles as defined by the DPPA. *See In re Rogers*, 513 F.3d 212, 226 (5th Cir. 2008) (a statue that is unclear is open to more than one reasonable interpretation).

Accordingly, Sheriff Del Bosque, Executive Chief Peña, and Zapata County's motions to dismiss Gonzalez's DPPA claim will be denied.

### F. Defendants' Motion to Stay Discovery Pending Appeal

Defendants all move to stay discovery pending appeal of the Court's decision. (Dkt. No. 57 at 22); (Dkt. No. 66 at 10); (Dkt. No.60 at 10); (Dkt. No. 59 at 17); (Dkt. No. 58 at 17); (Dkt. No 75 at 11). Because no appeal is pending at this time, this motion is premature, and the motion will be denied for that reason. In the event any Defendant chooses to appeal any portion of this Order, the Court will reconsider a ruling on this request, given the circumstances at that time.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss, (Dkt. Nos. 57, 58, 59, 60, 66, 75), are **DENIED** in part and **GRANTED** in part.

Defendant Zapata County's motion to dismiss, (Dkt. No. 57), is **DENIED** as to Plaintiff's claims against Defendant Zapata County for municipal liability for release of the BIAR report, conspiracy to violate his Fourteenth Amendment rights, and violation of the DPPA, and those claims remain pending. The motion is **GRANTED** as to all other claims against Zapata County, which are hereby **DISMISSED**.

Defendant Raymundo Del Bosque's motion to dismiss, (Dkt. No. 59), is **DENIED** as to Plaintiff's claim against Del Bosque under § 1983 for a stigma-plus violation of his Fourteenth Amendment rights arising from the publication of the false information contained BIAR report in connection with the October 2022 Fourth Amendment infringement, his claim for conspiracy to violate his Fourteenth Amendment rights in

connection with the release of the BIAR report, and his claim for violating the DPPA, and those claims remain pending. The motion is **GRANTED** as to all other claims against Del Bosque, which are hereby **DISMISSED**.

Defendant Joe Peña's motion to dismiss, (Dkt. No. 58), is **DENIED** as to Plaintiff's claim against Peña under § 1983 for a stigma-plus violation of his Fourteenth Amendment rights arising from the publication of false information contained in the BIAR report in connection with the October 2022 Fourth Amendment infringement, his claim for conspiracy to violate his Fourteenth Amendment rights in connection with the release of the BIAR report, and his claim for violating the DPPA, and those claims remain pending. The motion is **GRANTED** as to all other claims against Peña, which are hereby **DISMISSED**.

Defendant Jose Martinez's motion to dismiss, (Dkt. No. 75), is **DENIED** as to Plaintiff's claim against Martinez under § 1983 for violating his Fourth Amendment rights for the May 2023 seizure, and that claim remains pending. The motion is **GRANTED** as to all other claims against Martinez, which are hereby **DISMISSED**.

Defendant Carlo Garcia's motion to dismiss, (Dkt. No. 66), is **GRANTED** in its entirety, and Plaintiff's claims against Defendant Carlo Garcia are **DISMISSED**.

Defendant Jaime Rene Rivera's motion to dismiss, (Dkt. No. 60), is **GRANTED** in its entirety, and Plaintiff's claims against Rivera are **DISMISSED**.

Although Plaintiff does not request that he be granted leave to amend his complaint, the Court *sua sponte* determines that further amendment would be futile as Plaintiff has failed to cure the pleading deficiencies addressed in the first, (Dkt. Nos. 5, 6, & 7), and second, (Dkt. Nos. 25, 26, 27, & 28), groups of motions to dismiss.

Finally, Defendants Del Bosque, Peña, and Martinez's requests to stay discovery pending appeal of the Court's decision are **DENIED** at this time.

It is so **ORDERED**.

**SIGNED** on September 17, 2024.

_____

John A. Kazen
United States District Judge